NOT DESIGNATED FOR PUBLICATION

No. 125,298

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.M.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RACHEL L. PICKERING, judge. Opinion filed January 13, 2023. Affirmed.

*Rebekah A. Phelps-Davis*, of Phelps-Chartered, of Topeka, for appellant natural father.

*Morgan L. Hall*, deputy district attorney, for appellee.

Before HILL, P.J., BRUNS and WARNER, JJ.

PER CURIAM: Father appeals the district court's determination that his minor daughter, A.M., is a child in need of care under the provisions of K.S.A. 38-2202(d). On appeal, Father contends that the State did not present clear and convincing evidence to establish that A.M. is a child in need of care. Viewing the evidence in the record in the light most favorable to the State, as we are required to do, we conclude that there is sufficient evidence to clearly and convincingly establish that A.M. is a child in need of care. Thus, we affirm the district court.

1

FACTS

In July 2020, the Kansas Department for Children and Families (DCF) received a report that A.M.—who was six years old—was left alone at a playground. At the time, A.M. was in the sole legal custody of her Father. After speaking with her and Father, a child protection specialist with DCF became concerned about their mental health. As a result, the child protection specialist referred them to Cornerstones of Care for family preservation services.

On September 24, 2020, the Topeka Police Department responded to Father's residence after dispatch received a 911 call from his address. Although the caller hung up without saying anything, the dispatch operator reported that a man could be heard yelling at a child in the background. Upon arriving at the Father's residence, Officer James Schneider spoke with both Father and A.M.

In speaking with A.M., Officer Schneider observed a scratch on her forehead. In speaking to Father and A.M., the officer learned that Father had thrown an alarm clock against a wall while he was upset, which then bounced off the wall and struck A.M. on her forehead. According to Officer Schneider, Father appeared to be "frazzled" about his parenting situation with A.M.

Officer Schneider described Father's residence as dirty with no running water. The officer also described soiled dishes sitting around and sharp items—such as knives and swords—hanging on the walls. In addition, Officer Schneider described A.M.'s room as having clothes strung about and a mattress on the floor as a bed. When the officer tried to turn on the light in A.M.'s bedroom, Father told him that he removed the lightbulb. After observing the conditions in the residence, Officer Schneider notified his supervisor and contacted DCF in an attempt to obtain resources to assist Father and A.M.

The next day, the child protection specialist from DCF went to Father's residence. Even though no one was home, Father had left a note indicating that he was trying to get the water turned back on. Later that day, Father called the child protection specialist and told him that A.M. "had run away again." The child protection specialist advised Father to call the police and report her as a runaway.

On the same day, the police received a report from a neighbor about a disturbance at Father's residence. Officer Schneider then returned to Father's residence and found him to be "agitated or frustrated." Father told the officer that he was bipolar and struggled with his parenting of A.M. Officer Schneider also spoke with the reporting neighbor who indicated that she had some concerns with A.M. living at the residence with Father after A.M. told her about "some stuff that happened . . . that day." The neighbor told Officer Schneider that A.M. had a new scratch on her nose and that Father had apparently struck A.M. at some point.

After Officer Schneider spoke with the neighbor, A.M., and Father, A.M. was placed in protective custody. According to Officer Schneider, Father agreed with placing A.M. in protective custody if it was "what was best for [her]."

After A.M. was placed in protective custody, the child protection specialist from DCF spoke with Father again. He noted his concern about Father's mental health status. In particular, he was concerned because Father told him that he was bipolar but had not been taking his medication. Moreover, a police report indicated that Father admitted he "was not able to control himself when he got angry."

According to the child protection specialist, A.M. reported that Father would "black out" and then "physically accost her." Based on his involvement with Father and A.M., the child protection specialist also had concerns about A.M.'s mental health. Specifically, he suspected "emotional abuse" and believed that A.M. "was not receiving

the kind of care and attention that she needed from Father to grow into a healthy adult." According to the child protection specialist, Father had "hit [A.M.] on the bottom hard enough where . . . she couldn't breathe well." As a result of the suspected neglect and/or abuse by Father, the child protection specialist recommended that A.M. be placed in temporary DCF custody.

On September 30, 2020, the State filed a child in need of care petition in district court. In the petition, the State alleged that A.M. was without adequate parental care or control and had been physically, mentally, or emotionally abused or neglected. At a temporary custody hearing held that day, the district court found that an emergency existed and placed A.M. into DCF custody. In making this determination, the district court also noted that Mother's whereabouts are unknown.

At a pretrial hearing held on March 2, 2021, Father's attorney was allowed to withdraw after indicating she was "not comfortable . . . continuing representation." The district court then appointed a new attorney to represent Father and continued the matter to May 17, 2021. The district court also admonished Father that he needed to start cooperating with DCF.

On May 17, 2021, Father requested the matter be scheduled for a hearing. The district court ordered Father to complete a hair drug test, comply with medication management, and consent to a psychological evaluation. However, it appears that Father failed to comply with the district court's order for drug testing. As such, the district court ordered Father to submit to drug testing on at least two more occasions, and he continued in his failure to comply. Finally, on September 2, 2021, Father submitted to a hair drug test, and the results were positive for both amphetamines and methamphetamine.

The district court held a two-day adjudication hearing commencing on October 19, 2021. In support of its petition, the State presented the testimony of five witnesses. In

4

addition, the State presented three exhibits that were admitted into evidence. On the first day of the hearing, the district court ordered Father to submit to a urinalysis drug test during the lunch break. Later that afternoon, the district court reported on the record that the results showed that the test was positive for methamphetamine. Officer Schneider and the child protection specialist both testified about the events leading to A.M.'s placement in the temporary custody of DCF. The other witnesses presented by the State testified about the events occurring since that time.

Lindsay Sabala, a case manager with KVC Kansas—which provided services from September 2020 until October 2021—testified regarding efforts to reintegrate A.M. into Father's residence. She testified that she was concerned about Father's lack of progress on completing the tasks in his assigned case plan tasks. In Sabala's opinion, A.M. should remain in DCF custody due to safety concerns regarding reintegration. Specifically, Sabala testified that she had concerns about: A.M.'s emotional safety due to Father's inability to regulate his emotions; Father's untreated mental health conditions; the results of Father's hair drug test; Father's emotional dysregulation; Father's inability to complete a parenting class or make progress in family therapy; Father's past physical abuse of A.M.; and the condition of Father's home.

Additionally, Sabala testified that she often saw Father become angry and confrontational. For example, during a family therapy session, Father said he was going to hurt someone and would be going to jail soon. He also told Sabala that he hoped something bad would happen to her or her children. Sabala also testified that during supervised visits, Father had a hard time regulating his emotions, and that A.M. was sensitive to his condition. According to Sabala, Father focused on the reasons for the referral and concerns about A.M.'s current placement during family therapy rather than on A.M. and how to best move forward. Sabala also testified that Father had not signed medical records releases, so she was unable to assess his progress in individual therapy,

that he refused to take parenting classes, and that he had not yet completed his required psychological evaluation.

Mary Elizabeth DeBoard, an outpatient therapist for KVC Behavioral Health, testified that she provided A.M. with individual therapy from December 2020 to the time of the hearing. In addition, she provided family therapy to both A.M. and her Father from December 2020 to May 2021. DeBoard opined that more therapy would be necessary before A.M. could safely reintegrate into her Father's residence. In particular, she testified regarding her concerns about A.M.'s and Father's lack of emotional regulation as well as Father's history of neglecting A.M.'s needs. According to DeBoard, A.M. reported living with bugs, sleeping in trucks, sleeping in storage units, and being hungry on occasion. DeBoard further testified that A.M. felt the need to control her Father's emotions and that this has a negative effect on her own mental health. DeBoard further opined that Father should participate in individual therapy, anger management, and a psychological evaluation before reintegration should move forward.

Tricia Musil, a child protection supervisor for DCF, testified that the department had received 14 reports of prior contacts with the family before the State filed the petition for a child in need of care. She indicated that 10 of those contacts specifically involved A.M. Musil indicated that DCF was particularly concerned for A.M.'s safety after law enforcement had been called to Father's residence two days in a row in September 2020. On the first day, A.M. had a scratch on her forehead after Father threw an alarm clock. On the second day, A.M. had a new scratch on her nose after Father threw a cell phone her direction. Musil testified that DCF also had concerns about Father's mental health status and indicated that A.M. made statements during a safe talk about Father blacking out, clawing at her face, and hitting her.

After the State presented its witnesses and exhibits, Father testified on his own behalf. He explained that he had been A.M.'s primary caregiver throughout her entire life

and that he has been diagnosed with bipolar disorder. According to Father, he resisted taking medications to treat his mental health condition because of the side effects. Father testified that he has learned other techniques to deal with his bipolar disorder. He testified that he took A.M. to all of her medical appointments and kept her up to date on vaccinations. Father also testified that A.M. enjoys participating in outdoor activities with him—such as hunting and fishing—and she also enjoys doing artwork.

Father denied ever physically abusing A.M. In addition, Father testified that on September 24, 2020, he was having trouble getting A.M. to complete her schoolwork. He explained that A.M. was being combative and not wanting to listen. Nevertheless, Father testified that he would never get so angry that he would hurt A.M. or put her safety in jeopardy. According to Father, A.M. threw an alarm clock at him, and when he threw it down "it might've . . . hit her in the head." Moreover, he denied intentionally hitting A.M. with the alarm clock. Also, Father indicated the scratch on A.M.'s face in September 2020 was from a cat scratch. Father testified that he agreed to allow the police to place A.M. in protective custody to "scare [her] a bit," and he did not realize the ramifications.

Father testified that he became depressed after A.M. was taken into custody and that he began frequently using drugs. He admitted he had not sought treatment for his drug use since receiving a positive hair drug test in September 2021. In addition, Father testified that he had used methamphetamine a few days before the adjudication hearing. Nevertheless, he testified that he was open to doing anything he needed to do to regain custody of A.M. and that he would provide a stable environment for her. He also testified that he understood he must complete the case plan tasks to regain custody of A.M.

On December 20, 2021, the district court entered a 13-page memorandum decision and order in which it determined by clear and convincing evidence that it is highly probable that A.M. is a child in need of care. First, the district found that under K.S.A. 38-2202(d)(1), A.M. lacked adequate parental care, control or subsistence, and the

condition is not solely due to a lack of financial means. Second, the district court found that under K.S.A. 38-2202(d)(2), A.M. is without the care or control necessary for her physical, mental, or emotional health. Finally, the district court ruled that under K.S.A. 38-2202(d)(3), A.M. has been physically, mentally, or emotionally abused or neglected or sexually abused.

In support of its conclusion that A.M. is a child in need of care, the district court discussed the evidence in detail. Likewise, in its analysis, the district court identified several facts that it found to be particularly significant. These facts included the incidents that initially brought A.M. into DCF custody, the incident in which Father threw a clock that struck A.M. in the forehead, the "serious meth use by Father," and "the issues of the relationship with the child and her behavior as it relates to Father."

ANALYSIS

On appeal, Father contends that the State did not present sufficient evidence to establish that A.M. is a child in need of care. It is undisputed that the State had the burden of proving to the district court "by clear and convincing evidence that the child is a child in need of care." K.S.A. 38-2250. It is also undisputed that "when an appellate court reviews a trial court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the child was a CINC." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008); see *In re D.H.*, 57 Kan. App. 2d 421, 430, 453 P.3d 870 (2019).

As the Kansas Supreme Court has held, the clear and convincing standard is an intermediate standard of proof in which the State must show more than a preponderance of the evidence but not the higher standard of beyond a reasonable doubt. *In re B.D.-Y.*, 286 Kan. at 693. In other words, evidence is clear and convincing if it is "sufficient to

establish that the truth of the facts asserted is 'highly probable.'" 286 Kan. at 696. In reviewing the record to determine if the State presented clear and convincing evidence to support the district court's conclusion, we do not weigh conflicting evidence, address witness credibility, or redetermine questions of fact. However, to the extent that we are required to interpret statutes, our review is de novo. *In re D.H.*, 57 Kan. App. 2d at 430.

Here, the district court concluded that it is highly probable that A.M. is a child in need of care under K.S.A. 38-2202(d)(1), (d)(2), and (d)(3). K.S.A. 38-2202(d) directs the district court to consider not only evidence based on the circumstances that existed at the time the child in need of care petition was filed, but also to consider the child's present circumstances at the time of the adjudication hearing. 57 Kan. App. 2d at 433. As this court has recognized, a child may qualify as a child in need of care even if only one of the subsections of K.S.A. 38-2202(d) is satisfied. See *In re K.W.*, No. 112,246, 2015 WL 802767, at *3 (Kan. App. 2015) (unpublished opinion). With these legal principles in mind, we now turn to the evidence supporting the district court's findings.

*K.S.A. 38-2202(d)(1)*

K.S.A. 38-2202(d)(1) focuses on whether a child "is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian." In considering the evidence supporting this factor, we note the statutory criterion "is framed in the present tense" so the determination depends upon "a view of the child's present circumstances existing on the day of the adjudication hearing." *In re D.H.*, 57 Kan. App. 2d 421, Syl. ¶ 4. Based on our review of the record, we find that the State presented clear and convincing evidence that A.M. is without adequate parental care or control.

First, the State presented evidence to establish physical violence. Although he denies that he acted intentionally, Father admits that he threw an alarm clock that struck

9

A.M. on the forehead. Father also admits that at the time of the incident, he was having trouble controlling A.M.'s behavior.

Furthermore, the State presented evidence regarding Father's admitted drug use—including testing positive for amphetamine and methamphetamine. In its memorandum decision, the district court pointed to evidence of Father's serious methamphetamine problem which interferes with his parenting. Moreover, Father admitted that he had not sought treatment for his drug problem.

Finally, the State presented evidence of Father's mental health condition. As the district court found, Father admitted that he was not taking prescribed medication. In addition, the evidence presented by the State through witnesses as well as through the reports of DCF and KVC reflect how Father's mental instability interferes with his ability to provide adequate parental care and control. Accordingly, we conclude that the district court's findings under K.S.A. 38-2202(d)(1) are supported by clear and convincing evidence.

*K.S.A. 38-2202(d)(2)*

K.S.A. 38-2202(d)(2) focuses on whether a child "is without the care or control necessary for the child's physical, mental or emotional health." Again, in considering the evidence supporting this factor, we note the statutory criterion is framed in the present tense. As a result, the determination depends on "a view of the child's present circumstances existing on the day of the adjudication hearing." *In re D.H.*, 57 Kan. App. 2d 421, Syl. ¶ 4.

The State presented evidence that Father struggled with controlling A.M.'s behavior and that he responded with anger when she does not do what he wants her to do. The State also presented testimony that Father had occasional "black outs" when he

would become upset and violent. As the district court pointed out, the evidence in the record shows that A.M. does a lot of emotional caretaking of her Father and that he depends on A.M. to regulate his emotions. Likewise, A.M.'s therapist testified that she has concerns about Father's present ability to parent the child. In particular, she opined that Father and A.M. are codependent, and that A.M. often takes on the role of the parent in emotional interactions between them. The therapist also opined that Father should participate in individual therapy, anger management, and a psychological evaluation before A.M. could safely be reintegrated with him.

The district court concluded that Father's "present intense meth use, untreated mental illness, emotionally strained relationship with his child, furthered by an alarming co-dependency with his child, and admitted past physical abuse" establishes that the child is without proper care and control necessary for A.M.'s physical, mental, or emotional health. Each of these findings are supported by clear and convincing evidence in the record on appeal. Hence, we conclude that the district court appropriately determined that A.M. is a child in need of care under K.S.A. 38-2202(d)(2).

*K.S.A. 38-2202(d)(3)*

K.S.A. 38-2202(d)(3) focuses on whether a child has "been physically, mentally or emotionally abused or neglected or sexually abused." K.S.A. 38-2202(y) defines "[p]hysical, mental or emotional abuse" as "the infliction of physical, mental or emotional harm or the causing of a deterioration of a child and may include, but shall not be limited to, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is endangered." In addition, harm is defined as "physical or psychological injury or damage." K.S.A. 38-2202(l). Because the factor is framed in the present perfect tense, we once again find that the court may consider evidence of abuse that occurred in the past and the present. *In re D.H.*, 57 Kan. App. 2d at 428.

11

As discussed above, Father admitted that he physically abused A.M. when he threw an alarm clock that hit her in the forehead. Although he denies intentionally trying to strike A.M. with the clock, the evidence presented by the State suggests that he intentionally threw it out of anger. The State also presented evidence that A.M. suffered a bruise on her head the day of the incident as a result of Father's throwing of the alarm clock. Additionally, A.M.'s therapist testified that she becomes fearful and upset when Father becomes angry, and the child protection specialist from DCF opined that A.M. was emotionally abused due to not receiving the care she needed from Father.

Based on the evidence in the record, the district court ruled that A.M. has "been physically, mentally or emotionally abused or neglected or sexually abused." K.S.A. 38-2202(d)(3). We also deem this finding to be supported by clear and convincing evidence in the record. Consequently, we conclude that the district court appropriately determined that A.M. is a child in need of care under K.S.A. 38-2202(d)(3).

CONCLUSION

Reviewing the record on appeal in a light most favorable to the State, we conclude that the district court's findings and determination that A.M. is a child in need of care are supported by clear and convincing evidence. Because it is not our role to reweigh the evidence in the record, we decline Father's invitation to review the facts anew. In reaching this conclusion, we note that a determination that a child is in need of care is often followed by continued efforts to rehabilitate the family and to reintegrate the child into the parent's care. Of course, this is dependent upon a parent's willingness and ability to satisfactorily fulfill the tasks required by a reintegration plan.

Affirmed.